Rebecca Noblin (Alaska Bar No. 0611080)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 1178
Homer, AK 99603
(907) 350-4822
rnoblin@biologicaldiversity.org

Kristen Monsell (*pro hac vice application forthcoming*)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldiversity.org

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br><br> *Plaintiff*, <br><br> v. <br><br> NATIONAL MARINE FISHERIES SERVICE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce, SAMUEL D. RAUCH, III, in his official capacity as Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service, and JON KURLAND, in his official capacity as Alaska Regional Administrator, National Marine Fisheries Service, <br><br> *Defendants*. | Case No. 3:26-cv-00154 |

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*     1
Case No. 3:26-cv-00154

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(5 U.S.C. §§ 701–706; 16 U.S.C. §§ 1151–1174, 1801–1891d; 42 U.S.C. §§ 4321–4347)

### INTRODUCTION

1. This action challenges Defendant National Marine Fisheries Service's (NMFS) decision adopting annual catch limits for the pollock trawl fishery in the Bering Sea and Aleutian Islands in violation of the Fur Seal Act, 16 U.S.C. § 1152, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), the Magnuson-Stevens Fishery Management Act (Magnuson-Stevens Act), 16 U.S.C. §§ 1801–1884, and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A).

2. The Fur Seal Act seeks to ensure the long-term conservation of the northern fur seal, including the portion of the population that breeds on the Pribilof Islands in the Bering Sea. To that end, the Act generally prohibits the harassment, hunting, capturing, and killing (i.e., "take") of northern fur seals. Despite these protections, the population of northern fur seals on the Pribilof Islands has been in decline for decades. Recent scientific breakthroughs have teased out a primary driver of that decline: prey competition with the commercial pollock trawl fishery.

3. Northern fur seals rely on large schools of pollock near the Pribilof Islands as a key source of food. The pollock are particularly important for lactating females. Lactating females rely on the large schools of pollock near the Pribilofs to feed efficiently, before returning to the colonies on the Pribilof Islands to nurse their pups.



Figure 1. A northern fur seal pup visits scientists hiding behind a rock on St Paul Island. Source: Lorrie Rea, University of Alaska Fairbanks, https://www.fisheries.noaa.gov/alaska/marine-mammal-protection/northern-fur-seal-research-alaska.

4. The Bering Sea and Aleutian Islands pollock trawl fishery disrupts this important feeding behavior. Each year, the fishery removes hundreds of thousands of tons of pollock from northern fur seal foraging habitat and disperses the schools of pollock that remain. This prevents lactating females from sufficiently feeding their pups, resulting in reduced pup survival and other harms.

5. Nevertheless, on March 10, 2026, NMFS issued the 2026–2027 Harvest Specifications for the groundfish fisheries, allowing the pollock trawl fishery to operate with no restrictions to protect northern fur seals from prey competition, 91 Fed. Reg. 11750 (Mar. 10, 2026), despite the burgeoning body of scientific evidence demonstrating such measures are needed to ensure the seals have enough to eat. NMFS also issued the harvest specifications based on a NEPA analysis that ignores recent scientific evidence

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.* 3
Case No. 3:26-cv-00154

demonstrating that the pollock trawl fishery is harming northern fur seals through prey depletion.

6. NMFS's authorization of the fishery without measures in place to address prey competition causes unlawful take of northern fur seals and is therefore arbitrary and capricious. NMFS's authorization of the fishery based on a NEPA analysis that fails to consider highly relevant factors and account for changed conditions and new information is also arbitrary and capricious. And these violations mean that NMFS's issuance of the harvest specifications is also unlawful under the Magnuson-Stevens Act.

7. Plaintiff Center for Biological Diversity therefore asks that the Court declare NMFS's 2026–2027 Harvest Specifications unlawful, order NMFS to adopt measures to mitigate the impacts of the pollock trawl fishery on the northern fur seals of the Pribilof Islands, and order NMFS to complete a new NEPA analysis that properly considers the impacts of the pollock trawl fishery on northern fur seals as required by law.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty); 28 U.S.C. §§ 2201–02 (power to issue declaratory judgments and grant relief in cases of actual controversy); 16 U.S.C. §1855(f) (review of actions under the Magnuson-Stevens Act);

and 5 U.S.C. § 702 (Administrative Procedure Act).

9. Venue is proper in the District of Alaska pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events and omissions giving rise to this action occurred here and because northern fur seals are found in Alaska.

**PARTIES**

*Plaintiff*

10. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, non-profit 501(c)(3) organization with offices across the country, including in Alaska. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. As part of its mission, the Center has for years worked on conserving marine ecosystems and seeks to ensure the protection of marine mammals from being incidentally harassed, injured, and killed by commercial fisheries. The Center has more than 100,000 members. Center members reside throughout the United States, including in Alaska. The Center brings this action on behalf of its members.

11. Center members derive recreational, professional, scientific, educational and aesthetic benefit from northern fur seals and their habitat. Center members visit the Aleutian and Pribilof Islands to observe, photograph, study and otherwise enjoy northern fur seals and their habitat. For example, one Center member guides wildlife viewing and birdwatching trips to St. Paul Island (one of the Pribilof Islands) and a variety of Aleutian Islands. This member has taken numerous trips to St. Paul Island to look for birds and

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*                                    5
Case No. 3:26-cv-00154

other wildlife, including northern fur seals. He plans to return to the Aleutians, where he may view northern fur seals on their annual winter migration, in late fall of 2026, and he plans to return to St. Paul Island in 2026 or 2027.

12. Plaintiff's members' use and enjoyment of northern fur seals is entirely dependent on the existence of healthy, sustainable populations in the Bering Sea, including the Pribilof Islands. The existence of healthy, sustainable populations in these areas is, in turn, dependent on a healthy ecosystem, including abundant amounts of pollock, which are the seal's primary prey in the Pribilof Islands.

13. For example, from the time they give birth through the time their pups are weaned, lactating females on the Pribilof Islands rely heavily on pollock. They need to access dense patches of high-quality pollock to get enough food, without which they cannot provide their pups with enough milk. Pups that do not receive adequate nutrition from their mothers are less likely to survive to adulthood.

14. The decline in northern fur seals on the Pribilof Islands coincides with increased effort by the pollock trawl fishery. The fishery is allowed to intensively fish in the waters surrounding the Pribilof Islands during the nursing period, removing significant amounts of pollock when the seals need it most. During the northern fur seal breeding season, the commercial pollock trawl fishery in the Eastern Bering Sea can compete directly with the seals for prey. The fishery also disperses fish, thereby reducing the density of individual prey patches and altering the number, size, or distribution of

schools of pollock. The reduced density of pollock schools, reduced number of high-density schools, and the creation of a less predictable and more diffuse prey base all reduce the ability of northern fur seals to feed optimally.

15. NMFS's authorization of the pollock trawl fishery without measures in place to protect the seals on the Pribilof Islands from prey competition harms northern fur seals and Plaintiff's members' interests in continuing to observe these animals in the wild. NMFS's authorization of the fishery has contributed to a localized population decline of the species, and will further perpetuate that decline, making it harder to see and enjoy northern fur seals in the future. Adopting measures to reduce the harmful effects of the pollock trawl fishery on northern fur seals will mitigate the population decline and overall stress on the species.

16. The above-described professional, aesthetic, recreational, educational and other interests of Plaintiff's members have been, are being, and, unless the relief requested in this case is granted, will continue to be adversely affected and irreparably injured by NMFS's violations of the Fur Seal Act, NEPA, Magnuson-Stevens Act, and the APA. The relief sought in this case will redress these injuries.

*Defendants*

17. Defendant NATIONAL MARINE FISHERIES SERVICE is a federal agency within the United States Department of Commerce that manages fisheries under the Magnuson-Stevens Act. NMFS issued the final 2026–2027 Harvest Specifications for

groundfish in the Bering Sea and Aleutian Islands at issue in this case.

18. Defendant HOWARD LUTNICK, U.S. Secretary of Commerce, is sued in his official capacity. As the highest-ranking official within the Department of Commerce, he has the ultimate responsibility for overseeing the Department and NMFS, and ensuring their actions comply with federal law, including the Fur Seal Act, Magnuson-Stevens Act, and NEPA.

19. Defendant SAMUEL D. RAUCH, III, is sued in his official capacity as NMFS's Deputy Assistant Administrator for Regulatory Programs. Deputy Assistant Administrator Rauch oversees NMFS's regulatory actions and programs and signed the final 2026–2027 Harvest Specifications at issue in this case.

20. Defendant JON KURLAND is sued in his official capacity as Regional Administrator for NMFS's Alaska Regional Office. Administrator Kurland oversees NMFS's regulatory and management programs for fisheries, marine mammals, and habitat conservation in Alaska.

## STATUTORY BACKGROUND

### Fur Seal Act

21. Congress enacted the Fur Seal Act in 1966 to "protect and conserve the North Pacific fur seal." Fur Seal Act of 1966, Pub. L. No. 89–702, 80 Stat. 1091, 1091 (1966), *see also* H.R. Rep. No. 89-2154, at 3 (1966) ("The purpose of this bill . . . is to provide for the protection and conservation of the North Pacific fur seals. . . .").

22.     The 1966 Act continued protections first reached in a multilateral treaty to manage the international harvest of northern fur seals, the North Pacific Fur Seal Convention of 1911. The Convention banned open-water hunting of northern fur seals and vested in the United States the authority to manage the on-land harvesting of northern fur seals for the benefit of all signatories: the United States, Great Britain (Canada), Japan, and Russia. When Congress passed the Fur Seal Act of 1966, it recognized that the Convention had been successful, noting that the northern fur seal population had recovered from a low population of 120,000 animals in 1911 to more than 1.5 million seals in 1966. H.R. Rep. 89-2154, at 4 (1966). Congress intended for this successful conservation of the seals to continue when it enacted the Fur Seal Act. *Id.* at 4–5.

23.     To achieve this goal, the Fur Seal Act contains a broad prohibition:

> It is unlawful . . . for any person or vessel subject to the jurisdiction of the United States to engage in the taking of fur seals in the North Pacific Ocean or on lands or waters under the jurisdiction of the United States, or to use any port or harbor or other place under the jurisdiction of the United States for any purpose connected in any way with such taking.

16 U.S.C. § 1152.

24.     The Act broadly defines "[t]ake or "taking" as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill." *Id.* § 1151(m).

25.     While the Fur Seal Act does not contain a definition of "harassment," Congress defined the term harassment in the Marine Mammal Protection Act in 1972 as follows:

> Any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.

*Id*. § 1362(18)(A).

26. The Act exempts certain subsistence take from the take prohibition, and states that Alaska Natives "who live on the Pribilof Islands are authorized to take fur seals for subsistence purposes" in accordance with regulations issued by the Secretary. *Id*. § 1153.

27. The Secretary, through NMFS, has issued regulations authorizing "Pribilovians . . . on the Pribilof Islands" to take northern fur seals "if such taking is (a) [f]or subsistence uses, and (b) [n]ot accomplished in a wasteful manner." 50 C.F.R. § 216.71. The federal government and the St. George and St. Paul tribal governments co-manage this subsistence take. *Id*. § 216.74.

28. The Fur Seal Act also directs the Secretary to "prescribe such regulations with respect to the taking of fur seals on the Pribilof Islands . . . as he deems necessary and appropriate for the conservation, management, and protection of the fur seal population." 16 U.S.C. § 1155(a). It also requires the Secretary to "conduct . . . scientific research and investigations on the fur seal resources of the North Pacific Ocean as he deems necessary to carry out the obligations of the United States under the Convention" and authorizes the Secretary to "permit, subject to such terms and conditions as he deems

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.* 10
Case No. 3:26-cv-00154

desirable, the taking, transportation, importation, exportation, or possession of fur seals or their parts for educational, scientific, or exhibition purposes." *Id.* § 1154.

## National Environmental Policy Act

29.     "NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331). NEPA does not mandate particular results but does prohibit uninformed agency action, directing agencies to (1) take a "hard look" at environmental consequences and (2) "provide for broad dissemination of relevant environmental information" to the public. *Id*. at 350–51; *see also* 42 U.S.C. § 4332(2)(C) (requirements for NEPA review). By instructing agencies to analyze the environmental consequences of a proposed action, NEPA's procedures ensure that important effects will not be "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 290 U.S. at 349 (citations omitted).

30.     NEPA requires agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *accord id*. § 4336(b)(1). A major federal action is one that is "subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

31.     If a proposed agency action "does not have a reasonably foreseeable significant effect . . . or if the significance of [the] effect is unknown," the agency may instead prepare an environmental assessment. *Id*. § 4336(b)(2). An agency must prepare

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*                    11
Case No. 3:26-cv-00154

an EIS if substantial questions are raised whether a project *may* have a significant effect upon the environment.

32. In undertaking its NEPA analysis, a federal agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and "make use of reliable data and resources." *Id.* § 4332(2)(D), (E). The federal agency must analyze "a reasonable range of alternatives to the proposed agency action." *Id.* § 4332(2)(C)(iii). NEPA also requires that the public receive the underlying environmental data from which the agency derived its opinion. *See id.* § 4332(2)(C).

33. An EIS may cover a multi-year federal action or project. But the NEPA process does not end with the preparation of an initial environmental impact statement.

34. According to the National Oceanic & Atmospheric Administration's NEPA Handbook (which applies to NMFS), NMFS must prepare a supplemental EIS for an ongoing federal action if "(1) [t]he decision maker makes substantial changes to the proposed activity or decision that are relevant to environmental concerns; or (2) . . . there are substantial new circumstances or information about the significance of the adverse effects that bear[] on the proposed activity or decision or its effects." Nat'l Oceanic & Atmospheric Admin., Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities 19 (2025).

35. To determine whether a supplemental EIS is necessary, the Handbook directs that a decisionmaker may create a Supplemental Information Report (SIR) to document the decision. *Id.* An SIR may only be used for the limited "purpose of determining whether new information or changed circumstances require the preparation of a supplemental [environmental assessment] or EIS." *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000). An SIR is not a NEPA document and cannot substitute for an environmental assessment or EIS. *Id.* at 565–66.

**Magnuson-Stevens Fishery Conservation and Management Act**

36. The Magnuson-Stevens Act governs fishing by vessels subject to the jurisdiction of the United States. *See* 16 U.S.C. § 1801(a). It seeks to "conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles." *Id*. § 1801(b)(1), (3).

37. The Magnuson-Stevens Act created eight regional fishery management councils and requires them to prepare "fishery management plans" for all fisheries under their respective authorities that require conservation and management. *Id*. § 1852(a), (h)(1). The North Pacific Fishery Management Council is the regional council with "authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska." *Id*. § 1852(a)(1)(G).

38. Among other requirements, fishery management plans must "establish a

mechanism for specifying annual catch limits in the plan . . . , implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery." *Id*. § 1853(a)(15).

39. Fishery management plans, and actions taken to implement such plans, must be consistent with ten "national standards" Congress established for fishery conservation and management. *See* 16 U.S.C. § 1851(a).

40. The first national standard requires that "[c]onservation and management measures [] prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery. . . ." *Id.* § 1851(a)(1). The second national standard requires that "[c]onservation and management measures [] be based upon the best scientific information available." *Id*. § 1851(a)(2).

41. The Magnuson-Stevens Act defines "[c]onservation and management" to include "all of the rules, regulations, conditions, methods, and other measures" to "rebuild, restore, or maintain . . . the marine environment" and "assure that . . . irreversible or long-term adverse effects on fishery resources and the marine environment are avoided . . . ." *Id*. § 1802(5). It defines "optimum" yield to include "the amount of fish which . . . will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems. . . ." *Id.* § 1802(33).

42. NMFS is the entity ultimately responsible for ensuring any actions it takes

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*　　　　　　　　14
Case No. 3:26-cv-00154

under the Magnuson-Stevens Act are lawful. Under the statute, NMFS can only approve fishery management plans and related actions, including harvest specifications, that are "consistent with . . . any other applicable law." *Id*. §§ 1853(a)(1)(C), 1854(a)(1); *see* § 1854(i) (requiring Secretary to ensure environmental review for fishery management plans complies with NEPA).

43. The Magnuson-Stevens Act provides for judicial review of NMFS's actions implementing a fishery management plan. *Id*. § 1855(f).

## Administrative Procedure Act

44. The APA grants a right of federal judicial review to any person who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

45. The APA provides that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

## STATEMENT OF FACTS

### The Northern Fur Seal

46. Northern fur seals are members of the "eared seal" family. Like sea lions, northern fur seals have external ear flaps and extremely long front flippers that they can use to sit upright and walk on all fours. Northern fur seals have extremely dense fur, covering their bodies up to the wrists of their flippers.



Figure 2. Adult male fur seal illustration. Source: NOAA Fisheries,
https://www.fisheries.noaa.gov/species/northern-fur-seal.

47. Northern fur seals are a pelagic pinniped, meaning they spend the majority of the year in the ocean. In the winter months, they generally migrate southward to the North Pacific Ocean. In the spring months, the seals begin a northerly migration to breeding colonies in the Bering Sea. During the summer months, the seals then congregate on land to breed, give birth, and nurse their pups. Males typically arrive at breeding grounds in May and depart in August, while females arrive at breeding grounds in June and depart in November.

48. The highly productive waters of the Eastern Bering Sea as well as isolation from most terrestrial predators makes the Pribilof Islands an especially important and attractive breeding ground for the species.

49. The Pribilof Islands in the Bering Sea support about half of the world's northern fur seal population. St. Paul Island hosts the greatest proportion of the northern

fur seal population, and the majority of pups are born on St. Paul.

50.    Since the 1980s, a colony of northern fur seals has become established on Bogoslof Island closer to the Aleutian Islands. In recent years, the number of pups on Bogoslof Island has surpassed the number of pups born on St. George, but total pup production numbers are similar between these two islands.



Figure 6. Designation of rookery complexes. Rookeries labeled in the same color are a part of the same rookery complex (figure from Zeppelin and Ream 2006 used with permission). Note that SP East = Vostochni, Morjovi, Polovina Cliffs, Polovina, Lukanin, and Kitovi (St. Paul); SP Reef Point = Gorbatch, Ardiguen, and Reef (St. Paul); SP English Bay = Zapadni, Little Zapadni, Zapadni Reef, and Tolstoi (St. Paul); SG South = Zapadni and South (St. George); SP North = East Cliffs, East Reef, North, and Staraya Artil (St. George).

Figure 3. Map of rookery complexes of the Northern fur seal. Source:  Conservation Plan for the Eastern Pacific Stock of Northern Fur Seal (Laaqudax̂) 26, https://bit.ly/4sj2ZDU.

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*                    17
Case No. 3:26-cv-00154

51. Female northern fur seals give birth to a single pup, typically in July or August, that weighs three to four pounds. After giving birth, they remain with and nurse their newborn pups for five to seven days. Thereafter, lactating females leave their pups to forage and then return to nurse approximately every three to nine days. By October or November, the pups molt and are weaned, and they are large enough to leave the Islands and begin the annual southward migration. Weaned pups typically spend nearly two years at sea before returning to the island of their birth.

52. From the time they give birth through weaning and departure from breeding colonies on the Pribilof Islands, lactating females rely heavily on dense aggregations of pollock.

53. The pollock schools are especially important for the seals that give birth and breed on St. Paul Island. Studies over decades have shown that pollock consistently provide a majority of the diet of these seals, from at least 60 percent, and up to 90 percent in some years, making pollock a vital contributor to energy consumed by pups in the form of milk during the constrained nursing period.

54. Most lactating northern fur seals forage within 400 kilometers, or 250 miles of the Pribilof Islands. Prior research, including pelagic sealing records dating back to 1883, has found that the female northern fur seal feeding habitat stretches along the Bering Sea shelf and slope from St. Matthew Island in the north to Unimak Island in the south.

## Population Decline and Depleted Status

55. The Alaska population of northern fur seals began to decline in the mid-1970s. By 1988, the population of northern fur seals had declined by more than 50 percent from a peak population of over 2 million seals in the 1950s.

56. NMFS designated the Pribilof Islands population of northern fur seals as depleted under the Marine Mammal Protection Act in 1988 due to sustained population declines. 53 Fed. Reg. 17888 (May 18, 1988).

57. In 1994, NMFS reclassified the stock as the Eastern Pacific stock, which includes the Pribilof Islands rookeries and the rookery on Bogoslof Island.

58. In total, the northern fur seal population in the Pribilof Islands has declined by 70 percent since the 1970s.

59. According to NMFS's most recent population estimate published in a draft stock assessment report in 2025, the population now consists of only 612,765 seals, which is a decline from the previous estimate of 626,618.

60. Most of the measured population decline is driven by declines in the size of the St. Paul Island colony populations. The number of pups born on St. Paul Island declined from roughly 175,000 annually in the 1980s and 1990s to 72,806 pups in 2021 and 66,774 pups in 2022.

61. In 2024, NMFS issued a document titled "Conservation Plan for the Eastern Pacific Stock of Northern Fur Seal (Laaqudax̂)." The plan states that it contains multiple

objectives aimed at facilitating the conservation and recovery of the stock. Among those include taking "management measures as necessary to eliminate or minimize human-caused adverse effects on northern fur seals or their habitats;" and "[c]ontinu[ing] and, as necessary, expand[ing] research and management programs to monitor trends and detect natural or human-related causes" of population decline, including studies to further evaluate the effects of prey competition from commercial fisheries. The plan, however, does not contain any specific conservation or mitigation measures aimed at reducing threats to the northern fur seal.

**The Bering Sea Pollock Trawl Fishery and Its Harmful Impacts to Fur Seals**

62. NMFS manages the groundfish fisheries of the Bering Sea and Aleutian Islands under the Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area (Groundfish Fisheries Management Plan) and regulations implementing that plan.

63. Each year, NMFS authorizes the removal of as much as two million metric tons of pollock and other groundfish from the Bering Sea and Aleutian Islands.

64. The pollock trawl fishery is one of the largest fisheries in the world.

65. Pollock are harvested by pelagic trawling, a non-selective fishing technique. Vessels over 300 feet long drag nets up to 400 feet wide and 100 feet tall close to the ocean floor, catching massive quantities of fish with each deployment.

66. The nets are non-selective, meaning that they catch other species, including

halibut and salmon. The nets often drag along the seafloor, destroying bottom habitat and catching and injuring important benthic animals, like king crab.

67.     Trawl vessels target large schools of pollock using sophisticated equipment and instruments such as sonar sensors.

68.     The fishing year is divided into two seasons, an A and B Season. During the A Season, January to mid-June, the fishing effort is concentrated in the southern Bering Sea close to the Aleutian Islands. During the B Season, mid-June to November, the fishing effort moves northward as the sea ice melts. The fishing effort extends over the continental shelf and along the continental slope of the Bering Sea. In the B Season, the pollock trawl fishery operates along the continental slope from St. Matthew Island in the northern Bering Sea to Unalaska in the southeast Bering Sea. The pollock trawl fishery operates near the Pribilof Islands. The pollock trawl fishery fishes close to the Pribilof Islands to the south and east sides of the islands.

69.     The Pribilof Islands Habitat Conservation Zone, an area around the islands and extending to the north and east of St. Paul Island and St. George Island, is closed to directed fishing for groundfish using trawl gear, including the pollock trawl fishery. 50 C.F.R. § 679.22(a)(6).

70.     The decline in the northern fur seal population since the 1980s correlates with the rapid growth of the pollock trawl fishery into a major industrial fishery.

71.     New scientific research indicates a direct link between the decline of the

northern fur seal population and prey competition from the pollock trawl fishery.

72. Recent studies show that during the northern fur seal breeding season from June through October, the pollock trawl fishery competes directly with seals for prey.

73. A study published in 2025 confirms earlier research findings that there is a high spatial overlap between the greatest areas of commercial fishery catches and the core feeding habitat of Pribilof Islands northern fur seals.

74. This feeding area overlaps with the pollock trawl fishery during the B Season, from mid-June through October, when the lactating females are feeding.

75. During the B Season, the fishery removes an average of 570,000 tons of pollock from the core feeding habitat of lactating female seals each year.

76. By removing such significant quantities of the northern fur seal's primary prey source, the fishery directly competes with the northern fur seal for prey.

77. The fishery also indirectly affects northern fur seal prey. The pollock that the fishery leaves behind are no longer in large schools that the northern fur seals can efficiently feed on. Rather, the fish are dispersed.

78. The pollock trawl fishery reduces the density of individual prey patches. The pollock trawl fishery alters the number, size, and distribution of pollock patches.

79. Lactating females on the Pribilof Islands, and especially those on St. Paul Island, rely on dense aggregations of pollock to get enough food and minimize trip duration while nursing pups.

80.     The result of the direct and indirect prey competition is that it is harder for lactating females to access dense patches of high-quality pollock and to supply their pups with sufficient milk over the duration of the summer breeding season prior to weaning.

81.     The lactating females have to work harder and spend more time feeding to provide their pups with sufficient milk during the summer and potentially produce less milk overall.

82.     Pups with mothers that spend longer foraging are less healthy due to the increased duration between nursing. Pups that leave the breeding colony with a lower weight are less likely to survive their first year of life. If pups cannot survive their first year, the population declines, as fewer seals mature to breeding age and return to the breeding colony.

83.     Modeling demonstrates that increased mortality of first-year pups explains the decline of northern fur seals on the Pribilof Islands.

84.     A recent study confirmed that decreased first-year survivability explains the year-on-year population declines in northern fur seals.

85.     Additionally, this study correlated decreased survivability of the first-year northern fur seals with the pollock catch. The study found a direct inverse relationship between the amount of catch within the northern fur seal foraging grounds and seal survival.

86.     When pollock catch is above about one million metric tons within about

300 kilometers of the Pribilof Islands, first-year survival of Pribilofs northern fur seals is suppressed.

87. The emerging body of scientific literature establishes that both direct and indirect prey competition disrupts lactating northern fur seals' ability to efficiently forage to feed their pups. Those pups are thereafter less likely to survive their first year of life, leading to overall reductions in the population.

88. In comments on the draft 2026–2027 Harvest Specifications for the pollock trawl fishery, Plaintiff provided NMFS with the extensive scientific literature documenting the harm the fishery is causing to northern fur seals, including population-level impacts from prey competition. Plaintiff also explained how NMFS's management of the pollock trawl fishery violates the Fur Seal Act by allowing the fishery to operate in a way that causes unauthorized takes of northern fur seals via prey depletion and urged NMFS to adopt mitigation measures to reduce such take. Plaintiff also urged the agency to prepare a new supplemental EIS to analyze new information regarding the extent of harmful environmental impacts of the pollock trawl fishery, including prey competition with northern fur seals.

**The 2026–2027 Harvest Specifications and NEPA Analysis**

89. On March 10, 2026, NMFS published the 2026–2027 Harvest Specifications for the groundfish fisheries in the Federal Register. 91 Fed. Reg. at 11750–99. NMFS published a correction to the total allowable catch limits for two classes of

vessels on March 19, 2026. 91 Fed. Reg. 13236 (Mar. 19, 2026).

90. To make the annual harvest specifications decision, NMFS applies the harvest specifications process required under the Groundfish Fisheries Management Plan. NMFS sets the harvest specifications after recommendations from the North Pacific Fishery Management Council. Under this process, NMFS issues new harvest specifications every two years that cover the next two-year period.

91. In its annual harvest specifications decision, NMFS establishes the total allowable catch for each groundfish species targeted by federally managed fisheries in the Bering Sea and Aleutian Islands. The total allowable catch is the amount of a fish species that a fishery can harvest each year.

92. For 2026 and 2027, NMFS has set the total allowable catch for pollock at 1,375,000 metric tons. 91 Fed. Reg. at 11758–62.

93. In response to Plaintiff's comments regarding the harm from prey competition that NMFS's authorization of the fishery causes, NMFS stated "that there is not sufficient information to determine if the pollock trawl fishery is disrupting fur seal feeding to an extent that results in take prohibited under the [Fur Seal Act]." 91 Fed. Reg. at 11795. According to NMFS, "[t]here is evidence suggesting nutritional limitation could be causing declines in segments (i.e., foraging complexes) of the northern fur seal population; however, there are increasing trends on some foraging complexes on the Pribilof Islands and neither trend is definitively linked to commercial fisheries,

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.* 25
Case No. 3:26-cv-00154

particularly the pollock fishery." *Id.*

94.     With the 2026–2027 Harvest Specifications, NMFS also published an SIR

to determine whether, in its view, any changes in fisheries management or new

circumstances require the preparation of a supplemental EIS for the groundfish harvest

specifications, or whether the agency believes it can continue to rely on an EIS it

completed in 2007 for its Alaska Groundfish Harvest Specifications. NMFS's SIR

explains the agency's decision not to prepare a supplemental EIS.

95.     With respect to prey competition, the SIR states that "NMFS is not aware

of any substantial new information on nutritional insufficiencies at this time as a result of

prey competition and foraging between marine mammals and Federal commercial

groundfish fisheries." SIR at 56.

96.     The SIR concludes that the 2026–2027 Harvest Specifications "will not

affect" the northern fur seal "in a significant manner or to a significant extent not already

considered in the 2007 EIS." SIR at 56. The 2007 EIS concluded that the level of prey

removal for all marine mammal stocks, including northern fur seals, would not have

significant detrimental effects on foraging success of any marine mammal stock.

## CLAIMS FOR RELIEF

### First Claim for Relief

### Violation of the Fur Seal Act and Administrative Procedure Act

97.     Plaintiff realleges and incorporates by reference, as if fully set forth herein,

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*                    26
Case No. 3:26-cv-00154

each and every allegation set forth in this Complaint.

98.     The issuance of the 2026–2027 Harvest Specifications is a final agency action within the meaning of the APA.

99.     The pollock trawl fishery takes northern fur seals through direct prey competition. The fishery harvests hundreds of thousands of pounds of pollock directly from the northern fur seals' feeding grounds. Such extensive harvest of northern fur seal prey disrupts the seals' important feeding behavior.

100.    The fishery also takes seals through indirect prey competition. The fishery disperses the large schools of pollock that lactating female fur seals rely on to efficiently feed and return to their pups. This disrupts the seals' normal feeding patterns, forcing the lactating females to search longer and further in attempting to obtain sufficient food.

101.    Both the direct and indirect prey competition from the fishery constitute harassment and are takes under the Fur Seal Act. Such take is prohibited under the Fur Seal Act.

102.    NMFS's current management of the fishery enables the ongoing take of northern fur seals. NMFS permits the fishery to remove hundreds of thousands of tons of pollock from the core feeding areas of the northern fur seal during the breeding, pupping, and nursing season.

103.    These takes not only harm individual animals but have a harmful impact on the northern fur seal population, especially the St. Paul rookeries, by making it less likely

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*                27
Case No. 3:26-cv-00154

pups will survive through their first year of life. This undermines the purpose of the Fur Seal Act to conserve the northern fur seal population.

104. NMFS's continued permitting of the fishery in a way that causes unauthorized take of northern fur seals is arbitrary, capricious, an abuse of discretion, and not in accordance with the Fur Seal Act, 16 U.S.C. § 1152, in violation of the APA, 5 U.S.C. § 706(2)(A). NMFS's issuance of the 2026–2027 Harvest Specifications is arbitrary, capricious, an abuse of discretion, and not in accordance with the Fur Seal Act, 16 U.S.C. §1152, in violation of the APA, 5 U.S.C. § 706(2)(A).

<strong><u>Second Claim for Relief</u></strong>

<strong>Violations of National Environmental Policy Act and Administrative Procedure Act</strong>

105. Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, each and every allegation set forth in this Complaint.

106. NMFS's issuance of the 2026–2027 Harvest Specifications constitutes a major federal action within the meaning of NEPA.

107. In issuing the 2026–2027 Harvest Specifications, NMFS relied on an SIR that fails to consider relevant information when it determined that no supplemental NEPA review was required.

108. The SIR did not acknowledge, much less analyze, new science relating to the impact of prey competition from the pollock trawl fishery on the northern fur seal. Despite Plaintiff's comments documenting these impacts, the SIR states that "NMFS is

not aware of any substantial new information on nutritional insufficiencies at this time as a result of prey competition and foraging between marine mammals and Federal commercial groundfish fisheries." As a result, the agency failed to take a hard look at the harms from the pollock trawl fishery on the northern fur seal and fully inform the public of the consequences of its action, as required by NEPA. NMFS's SIR and decision to forgo preparing a supplemental EIS and instead rely on a stale EIS when it issued the 2026–2027 Harvest Specifications is arbitrary, capricious, an abuse of discretion, not in accordance with NEPA, 42 U.S.C. § 4332(2)(C), and/or made without observance of procedure required by law, in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

### Third Claim for Relief

**Violation of Magnuson-Stevens Fishery Conservation and Management Act and Administrative Procedure Act**

109. Plaintiff re-alleges and incorporates by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

110. In setting the 2026–2027 Harvest Specifications, NMFS failed to consider relevant information regarding the negative effects to the northern fur seal from prey competition with the pollock trawl fishery. Without considering such information, NMFS has failed to take into account the protection of marine ecosystems, as required by the Magnuson-Stevens Act. 16 U.S.C. §§ 1851(a)(1), 1802(33). Such failure also means that NMFS established the 2026–2027 Harvest Specifications without considering the best available science as required by the Magnuson-Stevens Act. *Id.* § 1851(a)(2). The 2026–

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*
Case No. 3:26-cv-00154

29

2027 Harvest Specifications are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with the Magnuson-Stevens Act, *id*. § 1851(a)(1), (2), in violation of the APA, 5 U.S.C. § 706(2)(A).

111. In addition, for the reasons set forth above, the 2026–2027 Harvest Specifications are not consistent with the Fur Seal Act or NEPA. NMFS's decision to issue the harvest specifications despite their inconsistency with applicable law is arbitrary, capricious, an abuse of discretion, and not in accordance with the Magnuson-Stevens Act, 16 U.S.C. §§ 1853(a)(1)(C), 1854(a), in violation of the APA, 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests that the Court:

1. Declare that NMFS has violated and is violating the Fur Seal Act and the Administrative Procedure Act by authorizing the pollock trawl fishery in a way that takes northern fur seals;

2. Declare that NMFS has violated and is violating the National Environmental Policy Act and the Administrative Procedure Act by issuing the 2026–2027 Harvest Specifications based on an inadequate SIR and out-of-date EIS that does not adequately review relevant information regarding harm from the pollock trawl fishery on northern fur seals;

3. Declare that NMFS has violated and is violating the Magnuson-Stevens Act

and the Administrative Procedure Act in issuing the 2026–2027 Harvest Specifications;

4.  Order NMFS to complete a supplemental EIS on its authorization of the pollock trawl fishery that considers relevant new information regarding harm from the pollock trawl fishery on northern fur seals;

5.  Enjoin NMFS from permitting fishing activities that result in takes of northern fur seals, including but not limited to ordering NMFS to impose a time-area restriction protecting the northern fur seals' foraging grounds during the pupping season.

6.  Grant such other relief as this Court deems just and proper.

Dated:  April 8, 2026                    Respectfully Submitted,

 s/ *Rebecca Noblin*
Rebecca Noblin (Alaska Bar No. 0611080)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 1178
Homer, AK 99603
(907) 350-4822
rnoblin@biologicaldiversity.org

 s/ *Kristen Monsell*
Kristen Monsell (California Bar No. 304793)
(*pro hac vice application forthcoming*)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*